UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                        Criminal No. 16-cr-91-01-JL
                                Opinion No. 2017 DNH 224P

Brad Smith

## ORDER ON MOTION FOR MISTRIAL

This case poses the question of a prosecutor's duty, under Fed. R. Crim. P. 16(a)(1)(E), to disclose arguably inculpatory rebuttal evidence used solely during cross-examination of the defendant.

After two days of testimony and brief deliberation, a jury convicted Brad Smith of six counts of Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a).  Smith had confessed to making six video recordings of himself raping the three-year old daughter of his employer, at whose home Smith was working when he committed the assault.  The charged recordings were shot from the offender's point of view and did not show his face.  They did, however, record his voice, clothes and familiar surroundings, and show that the rapist, like Smith, had an uncircumcised penis -- an unfortunately graphic, but important, detail in this case.

Smith's confession occurred during a "Mirandized" custodial interrogation.  At his suppression hearing, he testified and admitted making the confession.  Testifying as the last witness in his defense at trial, however, Smith denied being the male in the videos, and named his brother as the culprit.[1]  Smith's end-of-trial direct examination was the first time in the course of the investigation and prosecution that Smith had accused his brother.  In neither of the prior occasions where the defendant spoke on the record of this case -- the videotaped confession recorded on the day of his arrest, and his testimony during a suppression hearing -- did Smith attempt to shift blame to his brother.

At the end of his cross-examination, the prosecutor showed Smith two pictures taken by law enforcement personnel, one of Smith himself (which the prosecutor had disclosed in discovery)

---

[1] Specifically, the defendant testified for the first time on direct examination that "I knew it wasn't me in the video, so there was really only one other option and that was that it was my brother in the video."  Trial Transcript ("Tr."), doc. no. 72 at 32.  On cross-examination Smith and the prosecutor had the following exchange:  "Q:  And you knew it was [your brother]? A: He's the only other person that it could have been."  Id.  At post-trial oral argument on this motion, defense counsel tried to parse Smith's words, noting that he testified only that his brother was the only other person who could have made the recordings, not that he actually did so.  Given the context, the court finds Smith's testimony to be directly accusatory.

and one of his brother (which had been neither disclosed nor produced), each with his penis exposed.  The former picture, Smith agreed, showed that his own penis was uncircumcised, as was the assailant's penis in the offending video recordings at issue.[2]  Smith also agreed that the other picture showed that his brother's penis was circumcised, unlike the assailant's penis.[3]  Investigators had only photographed and provided the brother's photo to the prosecution (at the prosecutor's request) during the trial on the day before the defendant testified.  After the close of evidence and soon after other post-evidence proceedings (a Rule 29 dismissal motion and a discussion about jury instructions), the defendant moved for a mistrial claiming the government's failure to produce the two photographs violated Fed. R. Crim. P. 16.

After two rounds of briefing and oral argument, the court denies defendant's motion.  The court does not rule on whether the government was obligated to produce defendant's brother's photograph.  Even if the prosecutor violated Rule 16, the evidence against the defendant was so completely one-sided and

---

[2] Transcript ("Tr."), doc. no. 72, at 87.

[3] Id.

insurmountably overwhelming that the defendant suffered no mistrial-triggering prejudice as a result of the non-disclosure.

## I.  BACKGROUND[4]

In January 2016, law enforcement personnel in Louisiana received information that Smith, then living and working on a local pecan farm owned and operated in absentia by the child victim's father in New Hampshire, could be involved in trading or possessing child pornography.  Investigators went to the farm to conduct a voluntary interview with Smith.  In the course of the interview, Smith conceded that there might be child pornography on his laptop computer that he "accidentally" downloaded.  The laptop and two external hard drives -- one silver and one black -- were seized from Smith's bedroom with his verbal and written consent.  The silver hard drive was attached to the laptop and the other was nearby on the same table.  A search of the silver hard drive revealed pornographic images (depicting both a child and adults known to Smith) and six separate video recordings of a younger child being raped in various ways.  One of the investigators, Louisiana Trooper (then-Investigator) Georgiana Kibodeaux, recognized the child

---

[4] The facts recited here are taken from trial testimony.

from a photograph she had seen on Smith's refrigerator earlier in the day.

Smith later came to Trooper Kibodeaux's office for a videotaped "Mirandized" interview, portions of which were played for the jury. During the course of the interview, Smith readily confessed to viewing and trading child pornography. Kibodeaux eventually confronted Smith with a still photo of the child victim. Smith identified the girl in the picture as the daughter of his employer, who lived in New Hampshire and who owned the Louisiana pecan farm where Smith was living and working. He said he was close with both the girl and her family. Kibodeaux informed Smith that they had found child pornography on his computer showing the girl being vaginally and orally raped, but not the rapist's face. Smith admitted that he was the man in the video. He said the assault took place on a single afternoon in his employer's barn in Loudon, New Hampshire when he was working at the property the previous spring. He made no mention of his brother.

Smith was arrested immediately after his confession, and indicted in this district. The six counts against him related to the six video recordings he admitted making and participating

in.[5]  A search of his residence had yielded additional evidence

that tied him to the charged recordings:

- a pair of athletic shoes of the same style and color (and with the same color shoe laces) as the ones worn by the rapist, clearly identical -- right down to a small spot or stain on the toe of one shoe -- to those worn by the perpetrator;

- a carpenter's level that appeared identical to one appearing in one of the video recordings;

- several pairs of pants with Smith's name on them that appeared identical to those worn by the man in the video recording.

In addition to this evidence, a set of "Google Glass"

eyeglasses[6] were found on a table next to Smith's bed, which

Smith testified belonged to him.  The glasses were significant

because, according to testimony from a government forensic

computer expert, metadata from still images of the child victim

taken at approximately the same time as the charged video

recordings showed that they were taken with Google glasses.[7]

The forensic examiner also testified that the charged

videos were stored electronically with the same filing system

---

[5] The recordings range from ten to ninety seconds in length.

[6] For purposes of this order, it is sufficient to describe Google Glass as a type of camera worn in the same manner as glasses.

[7] During his confession, Smith said he recorded the sex acts with his cellphone camera, which had since been destroyed.

and in the same hard drive location that Smith admitted using to store numerous other pornographic images and videos depicting both a child and adults that he knew personally.

Finally, on direct examination during the government's case-in-chief, the victim's father identified the location of the sexual assaults in the charged videos as a barn on his Loudon property where the defendant was working at the time. He also testified that Smith owned Google glasses that he frequently wore and never shared. He further testified that Smith had a "close" relationship to the victim and her twin sister, who he said, "loved" the defendant.[8] On the other hand, he described Smith's brother, who worked for a short time on the property, as "standoffish" to the girls.[9]

As previously noted, the charged recordings were shot from the point of view of the offender and did not show his face. They did, however, show his uncircumcised penis. Testifying in his defense, Smith denied being the male in the video, claiming that his brother was the culprit. Specifically, Smith testified on direct examination that "I knew it wasn't me in the video, so

---

[8] The victim's father testified that Smith was close to the entire family, and that he and his wife considered naming Smith the children's guardian if they were unable to care for them.

[9] Tr., doc. no. 71, at 27.

there was really only one other option and that was that it was my brother in the video."[10]  On cross-examination Smith and the prosecutor had the following exchange:  "Q: And you knew it was [your brother]?  A: He's the only other person [besides myself] that it could have been."[11]  Smith also testified that his confession was a lie, and that he was just telling law enforcement agents "what he thought they wanted to hear,"[12] claims he had never made at his suppression hearing where he underwent full direct and cross examination regarding his "Mirandized" confession.

Neither the photographs in question nor the appearance of genitalia they depict were introduced or referred to in any way

---

[10] Tr., doc. no. 72, at 32.

[11] Id. at 62.

[12] In addition to claiming that his brother was the man in the videos, Smith also testified that he had found the hard drive containing the charged videos in a room that his brother was occupying for a short time at the farm.  He testified that he was beginning a lengthy erasure process when the drive was seized after being found attached to his laptop.  Smith conveyed none of this information to authorities between the time of his January 2016 arrest and his trial testimony.  The court points this out not to suggest that the defendant had any obligation to communicate with the authorities at any time (which, of course, he did not), but rather because it is important in evaluating the defendant's claim that he was prejudiced by the timing of the use of the photo.

during the prosecution's case-in-chief or the defendant's direct examination. At the very end of the defendant's cross examination, the prosecutor showed Smith two pictures, one of Smith himself and one of his brother, each with his penis exposed. The former picture, Smith agreed, showed that his own penis was uncircumcised, as was the perpetrator's. Smith also agreed that the picture of his brother (obtained by the prosecution during the trial, the day before the defendant testified) showed that his brother's penis was circumcised, unlike the perpetrator in the video recordings. It was undisputed at trial that the second photograph excluded the defendant's brother as the perpetrator.

The photograph was marked as an exhibit and admitted by the court without objection,[13] although a mistrial motion eventually followed. Defense counsel requested a sidebar conference, at which counsel informed the court that they hadn't received either photograph in discovery. The prosecutor argued that he had no obligation under the Rules of Criminal Procedure to provide the defense with either photograph prior to the

---

[13] At post-trial oral argument on the instant motion, defense counsel confirmed that they had not objected to the admission of the photograph at trial. The defense did, however, eventually request a mistrial.

defendant's testimony.  At sidebar, the court indicated that it did not believe that Rule 16 required automatic disclosure of the photographs, and inquired whether the defense's discovery request letter covered the photographs.  Defense counsel could not -- at that time, at sidebar -- point to any such discovery request.  The court then again admitted the photograph of the defendant's brother into evidence.  The defense neither objected nor moved to strike, nor sought any other form of relief at that time[14] (but the defendant moved for a mistrial thereafter during a break).  The prosecutor concluded his cross-examination and, after a brief re-direct examination, the defense rested.

After the close of evidence, the court excused the jury and held a brief jury charge conference on the record.  Defense counsel renewed its motion for acquittal under Fed. R. Crim. P. 29, which the court took under advisement.  The defense made no motion for relief relative to the photographs at that time.

The court brought the jury back into the courtroom for closing arguments and instructions, but because the court then realized that it wished to revisit the photograph disclosure issue before closing arguments, it immediately re-excused the

---

[14] The defendant's mistrial motion inaccurately claimed that counsel objected.  Counsel confirmed the lack of objection at the hearing on this motion.

jury and conducted further proceedings.  The court developed a record of the prosecution's acquisition of the photographs and its prior knowledge of the brothers' anatomical differences. The prosecutor explained that while he had been considering calling defendant's brother as a witness for about a week, the photograph of his uncircumcised penis was taken at the prosecutor's direction the previous day by a federal agent. Defense counsel argued that he had requested such evidence in a pre-trial discovery request.  After a discussion of Fed. R. Crim. P. 16, the court indicated it was taking no immediate action with respect to the claimed discovery violation.  The court further explained that the discovery issue "may affect the way [counsel] want[s] to close," and that "whether and the extent to which you want to rely on [the photographs] in your closing is completely up to [counsel] . . . [because] closings sometimes impact analyses of prejudice."[15]  Defense counsel then moved for a mistrial, which the court took under advisement.

During closing argument, the prosecutor made only one indirect reference to the brother's picture.  After summing up the other evidence pointing to defendant's guilt and defendant's attempt to pin the crime on his brother, the prosecutor said

---

[15] Tr., doc. no. 72 at 97, 101.

simply that "the penis of the person in the video is not [defendant's brother's]."  The jury deliberated for a short time before returning guilty verdicts on all counts.

## II.  __LEGAL STANDARD__

The court is permitted to grant a mistrial if "improper evidence came before the jury."  United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993).  But "[d]eclaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes the jury's exposure to the evidence is likely to prove beyond realistic hope of repair."  United States v. Trinidad-Acosta, 773 F.3d 298, 306 (1st Cir. 2014) (internal quotation marks omitted).

## III. __Analysis__

Discovery obligations in criminal proceedings are governed by Fed. R. Crim. P. 16.  "Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph . . . documents, data, photographs . . . if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item belongs to or came from the defendant."

Fed. R. Crim. P. 16(a)(1)(E).  If the government is found to have breached its discovery obligations, the court is empowered to, inter alia, grant a continuance, prohibit the party from introducing evidence not disclosed, or enter such other order as it deems just under the circumstances.  Fed. R. Crim. P. 16(d)(2).

The parties now agree that the defense requested the material at issue in this case.  Neither party could point to any such request during the sidebar conference referenced above, however, or as part of the defendant's oral mistrial motion at trial.  Rather, defense counsel pointed only to a discovery request regarding identification procedures.[17]  It has since been determined that defense counsel made a comprehensive request in the usual way, by a comprehensive letter to the prosecution.

The prosecution's discovery obligations continue throughout the pre-trial and trial periods, Fed. R. Crim. P. 16(c), so it makes no difference that the prosecution only arranged for and came into possession of the brother's photograph during the trial, the day before the defendant's testimony.  The prosecution makes no argument that its late creation and

---

[17] Tr., doc. no. 72, at 100-101; Defendant's discovery request, doc. no. 64-1.

acquisition of the photograph relieved it of its disclosure obligation if required by Rule 16.

Smith argues that the government breached its obligation under Rule 16(a)(1)(E)(i) by failing to produce either the photograph of Smith's genitalia taken at the time of his arrest or the photograph of Smith's brother with his genitalia exposed, as both were material to his defense. He also claims that the failure to produce the photo of his own genitalia violated subsection (a)(1)(E)(iii) because it "came from him," in the sense that it was a photograph of his anatomy, taken in connection with his arrest, booking and processing.

## A.    Photograph of defendant's own anatomy

The photograph of the defendant himself requires little discussion. The government argues that it fulfilled its obligation with respect to the photograph of Smith himself when it provided the defense with a search warrant return that listed, inter alia, the photograph at issue. The defense conceded at oral argument that the government, by putting the defense on notice of the photographs, fulfilled its obligation to "permit the defendant to inspect" it. Fed. R. Crim. P. 16(a)(1)(E). See United States v. Gleason, 616 F.2d 2, 25 (2d. Cir. 1979) (finding that Rule 16 disclosure obligation was

14

satisfied by making evidence available to the defendant prior to trial).  Instead, the defense argued that it was misled by the fact that the government produced all photographs taken of Smith except the one showing his genitalia.  The defense, however, offered no authority to suggest that this circumstance negated the government's compliance with Rule 16.  The simple fact is that the prosecution provided specific notice of the photograph's existence and its availability for inspection by defense counsel on request.  This was sufficient to satisfy its obligation under Rule 16.

## B.  **Photograph of defendant's brother's anatomy**

The picture of Smith's brother presents a more complicated question:  whether the photograph was "material to preparing the defense," within the meaning of Rule 16(a)(1)(E)(i).  The appellate court authority on this question is arguably split.  Not surprisingly, the parties take opposing positions.  The government argues that it had no obligation under Rule 16 to produce the photograph prior to its introduction at trial because the evidence was merely non-exculpatory impeachment evidence and thus not "material to preparing the defense" under Rule 16.  The defense argues that the photograph was "material to preparing the defense" as Rule 16 defines that term, because

15

he was prejudiced both by a deprivation of complete information on which to base defense decisions, and by the impact of its dramatic introduction.

1. The prosecution's view of "materiality" under Rule 16(a)(1)(E)(i)

The government initially argued[18] that information in its possession not used in its case-in-chief, and which merely impeaches testimony or rebuts a position taken in the defense case (rather than adding to the evidence in the defendant's favor) is not discoverable under Rule 16(a)(1)(E)(i). This argument finds support in several Circuit Courts of Appeals. For example, in United States v. Caro, 597 F.3d 608, 621 (4th Cir. 2010), the Fourth Circuit Court of Appeals held that "material[ity] to preparing the defense" under Rule 16(a)(1)(E)(i) requires "'some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" (quoting United States v. Ross, 511 F.2d 757, 763 (5th Cir. 1975)); see also, United States v. Lykins, 428 F. App'x

---

[18] The court permitted briefing and oral argument on the alleged Rule 16 violation and then permitted further briefing on the prejudice issue because the parties failed to fully join that issue.

621, 624 (6th Cir. 2011) (holding that "there must be an indication that pre-trial disclosure would have enabled the defendant to 'alter the quantum of proof in his favor,' not merely that a defendant would have been dissuaded from proffering easily impeachable evidence") (quoting United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993)); United States v. Henderson, 564 F. App'x 352, 365 (10th Cir. 2014) (same).

In a similar vein, the court in Stevens observed that evidence is "material" under Rule 16(a)(1)(E)(i) if "it could be used to counter the government's case or to bolster a defense," not "merely because the government may be able to use it to rebut a defense position."  985 F.2d 1175, 1180 (2d Cir. 1993); see also Gleason, 616 F.2d at 25 ("The government is not obligated . . . to furnish [the defense] with otherwise irrelevant material that might conflict with his testimony."); United States v. Delia, 944 F.2d 1010, 1018 (2d Cir. 1991) ("We know of no legal principle that requires the prosecution to disclose its proposed rebuttal evidence to the defendant, to help him decide whether to pursue a particular contention.").

This view, taken by a greater number of appellate courts that have examined the issue, and consistent with much of the "conventional wisdom" of trial practice requires little more expansion or elaboration.  It is based on the idea that the

prosecution's discovery obligations cover material that is exculpatory, and that could be used to impeach prosecution witnesses, but not inculpatory material that is not used in the prosecution's case in chief.  But of course, the court's obligation is to enforce the Federal Rules of Criminal Procedure, as opposed to conventional trial wisdom and traditional practice,[19] and other courts of appeals have taken a different view of Rule 16(a)(1)(E) materiality -- one that aligns with the defense's position here.

2.   The defense's view of "materiality" under Rule 16(a)(1)(E)(i)

Contrary to the government's original post-trial position,[20] its view of Rule 16's "materiality" element is not unanimous. At least two Courts of Appeals have concluded that Rule 16's disclosure obligations include inculpatory evidence that could have altered such basic trial strategy as a defendant's decision to testify.  See United States v. Muniz Jaquez, 718 F.3d 1180,

---

[19] For their part, defense counsel at sidebar asserted that they should have received the photograph as part of "open-file discovery," which is the traditional practice in many New Hampshire state courts.  Again, however, the Federal Rules of Criminal Procedures apply here, as opposed to any unwritten rules or understandings, and they require something less than "open-file discovery."

[20] Gov't. Obj., doc. no. 65, at 5.

1183 (9th Cir. 2013) ("Even inculpatory evidence may be relevant. A defendant who knows that the government has evidence that renders his planned defense useless can alter his trial strategy."); United States v. Doe, 705 F.3d 1134, 1151 (9th Cir. 2013) ("Even if the documents caused [the defendant] to completely abandon [an] entrapment defense and take an entirely different path, the documents would still have been 'material to preparing the defense' under Rule 16(a)(1)(E)(i).").

As the Court of Appeals for the District of Columbia Circuit explained in rejecting an argument that "materiality" excludes impeachment or rebuttal evidence:

> The plain language of Rule 16 . . . does not support the government's interpretation. This rule covers evidence which is material "to the preparation of the defendant's defense." (emphasis added). The government ignores the words we have just italicized, reading the rule to refer to evidence which is "favorable or helpful to a defendant's defense." See Govt. Br. at 35 n.15. The rule as written does not compel the conclusion that inculpatory evidence is immune from disclosure. Inculpatory evidence, after all, is just as likely to assist in "the preparation of the defendant's defense" as exculpatory evidence. In other words, it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths.

United States v. Marshall, 132 F.3d 63, 67 (D.C. Cir. 1988)

(footnote omitted).

The D.C. Circuit's observation about the plain language of Rule 16(a)(1)(E)[21] is therefore not insignificant. Principles of statutory construction apply with equal force to the Federal Rules. See Yousuf v. Samantar, 451 F.3d 248, 255 (D.C. Cir. 2006) (applying "customary tools of statutory interpretation" to resolve issue related to Fed. R. Civ. P. 45); see also Delgado v. Pawtucket Police Dept., 668 F.3d 42, 49 (1st Cir. 2012) ("In interpreting a formal rule of procedure, our starting point is the language of the rule itself."). Here, Rule 16(a)(1)(E) requires disclosure if (i) "the item is material to preparing the defense" or (ii) "the government intends to use the item in its case-in-chief at trial." Both the use of the disjunctive "or," see Loughrin v. United States, 134 S. Ct. 2384, 2390 (2014) ("the words it connects are to be given separate meanings") and the rule against surplusage, see O'Connor v. Oakhurst Dairy, 851 F.3d 69, 73 (1st Cir. 2017) (courts "must give independent meaning to each word in a statute and treat none as unnecessary") strongly suggest a meaningful distinction between case-in-chief evidence (and its impeachment) on one hand, and evidence "material to preparing the defense" on the

---

[21] At the time Marshall was decided, the provisions in question were contained within Rule 16(a)(1)(C).

other.  This lends credence to the idea that the latter at least includes inculpatory evidence.

The Marshall Court recognized that the D.C. Circuit had previously used the "alter the quantum of proof in his favor" language that was used by those courts that side with the government's view here.  132 F.3d at 68 (citing United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)).  But, the Court concluded, evidence that "alters the quantum of proof" is not limited to exculpatory evidence.  Instead,

> a defendant in possession of such evidence may "alter the quantum of proof in his favor" in several ways: by preparing a strategy to confront the damaging evidence at trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a defense which is undercut by such evidence.

Id. (emphasis added).

While the First Circuit Court Appeals has not spoken directly to this issue, it has made the following observation about Rule 16, albeit in the context of a different provision of the rule regarding defendant's oral statement:

> Rule 16's mandatory discovery provisions were designed to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.

United States v. Lanoue, 71 F.3d 966, 976 (1st Cir. 1995) (abrogated on other grounds by United States v. Watts, 519 U.S. 148 (1997)).  In addition, at least one district court in this circuit has held that "Rule 16 is not limited to evidence that is helpful to a defendant's case because '[i]t is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths.'"  United States v. Facteau, No. 15 CR 10076 ADB, 2015 WL 6509120, at *1 (D. Mass. Oct. 28, 2015), objections overruled, No. 1:15 CR 10076 ADB, 2016 WL 4445741 (D. Mass. Aug. 22, 2016) (quoting United States v. Safavian, 233 F.R.D. 12, 15 (D.D.C. 2005)).

In its supplemental brief on this issue, the government acknowledges the Marshall line of cases, but tries to blunt its force in two ways.  First, the government argues that those cases stand for the proposition that potentially inculpatory evidence is material under Rule 16 only "if it relates to the charges at issue."[22]  Here, the government argues, the brother's picture did not relate to the charges because while it may have excluded one possible perpetrator, it did not, in isolation, "make it more likely that the defendant was the perpetrator,

---

[22] Gov't. Supp. Memo, doc. no. 68, at 7.

(i.e., it was not inculpatory)."[23]  The court is unconvinced.  As the government acknowledges, Marshall held that the evidence in question there was discoverable because it was "inculpatory when considered in conjunction with other evidence."  132 F.3d at 68.  So it is here.  The picture of Smith's brother was inculpatory when viewed in connection with Smith's accusation of his brother, followed by his testimony that he "knew it was [his brother]" because "it could not have been anyone else" in the charged videos.  Indeed, the prosecution itself has affirmatively stated:  "It was the picture of the defendant's brother which excluded the brother as the perpetrator."[24]  So even if the Marshall rationale requires that the evidence in question relates to the charge at issue, the brother's photograph fits the bill "when considered with other evidence," such as the defendant's testimony as developed on cross-examination by the prosecutor.

Second, the government argues that it was engaging in "impeachment by contradiction," and needed not disclose its evidentiary means of doing so.  Indeed, the government argues

---

[23] Id. at 8.

[24] Gov't Obj., doc. no. 65, at 4; see also id. at 1 (noting that the brother's picture "excluded him as the person in the charged videos.").

that it "used the photograph of the brother for one reason only -- to impeach the defendant's testimony . . . In other words, the photograph's sole value in the case was to impeach the defendant."[25] This argument carries little force, as the brother's picture was not -- or at least was not only -- impeachment evidence. As the government acknowledges, impeachment undermines a witness' credibility.[26] The brother's photograph was not, however, introduced only to attack Smith's credibility. The picture was substantive evidence tending to eliminate the person the defendant identified as the only possible perpetrator besides himself. Again, the defendant had testified that "it could not have been anyone else" but his brother in the charged videos, and in the prosecution's own words, the photograph "exclud[ed] him as the person in the charged videos."[27] That is not impeachment. That is evidence negating a defense, and, to quote Fed. R. Evid. 401's familiar definition of relevant evidence, it made a fact "of consequence" "less probable than it would have been without the evidence."

---

[25] Gov't Supp. Memo., doc no. 68, at 8; see also, Gov't. Memo., doc. no. 65, at 4.

[26] Gov't. Supp. Memo., doc. no. 68, at 8.

[27] Gov't. Obj., doc no. 65, at 4; see also id. at 1 (noting that the brother's picture "excluded him as the person in the charged videos.").

Fed. R. Evid. 401(a),(b). As the prosecution argued in closing, "the penis of the person in the video is not [defendant's brother]."[28]

Further characterizing the photograph as impeachment evidence only, the government argues that "its case did not even mention the brother because he was irrelevant to the government's theory. The brother was only implicated in the trial because the defendant exercised his right to testify, at which time he accused his brother of producing the charged images."[29] Neither point is entirely accurate. The prosecution did, in fact, make specific reference to the defendant's brother during its case-in-chief. It did so on re-direct examination of the victim's father, countering the idea (only vaguely alluded to at that point during the defense's cross-examination of the victim's father) of the brother as a possible suspect. And that questioning on re-direct examination by the government was the first time the defendant's brother was invoked in the context of

---

[28] Tr., doc. no. 72, at 115. The government's argument that "[e]ven after impeachment, the universe of potential perpetrators remained the same (males with uncircumcised penises)" rings a bit hollow. See Gov't. Supp. Mem., doc. no. 68, at 8. The defendant's testimony had reduced that "universe" to one man: the defendant's brother, because "it could not have been anyone else."

[29] Gov't. Supp. Memo., doc. no. 68, at 7-8.

contact with and access to the child victim.[30]  This occurred

well in advance of the defense case and defendant's testimony.

Thus, since the photograph in question was not merely

impeachment material, cases standing for the proposition that

the government need not disclose evidence used solely for

impeachment are inapposite.  The cases cited by the government

bear this out.  For instance, the prosecution in United States

v. Gilmore, 553 F.3d 266, 271 (3d Cir. 2009) was permitted to

cross-examine the defendant about his prior drug convictions

after he testified that he had never sold drugs.  Id. at 270.

However, the court allowed only inquiry about the convictions,

denying the affirmative introduction of proof because the

defendant did not deny the convictions on cross-examination.

Id.  Next, the court provided a limiting instruction to the jury

that the convictions were only relevant for credibility

purposes.  Id.  Finally, and as especially noteworthy here,

before cross-examining the defendant, the prosecution in Gilmore

undertook a time-honored and highly advisable measure that would

have been welcomed by the court in this case, without any

strategic or tactical cost to the government:  it "advised the

District Court that it intended" to pursue the cross-examination

---

[30] Tr., doc. no. 71, at 27.

in question.  Id.  None of those factors are present in this case.

Nor is the government's position strengthened by reliance on United States v. Kohli, 847 F.3d 483, 493 (7th Cir. 2017). In that case, the defendant, a doctor charged with illegal drug distribution, testified that no patient had ever died in his care.  On cross-examination, the government confronted the doctor with (undisclosed) coroner records showing the opposite. The court permitted the cross-examination over defendant's Rule 16-based objection.  The records were not introduced into evidence.  On appeal, the Seventh Circuit Court of Appeals rejected the defendant's argument under Rule 16 for several reasons that are both germane to the instant dispute and unhelpful to the government's position.  The Court first noted that the patient deaths became material only after the defendant voluntarily testified on direct examination that no one had died in his care, id. at 493, but only for the purpose of impeaching the defendant on a collateral matter.  Id.  The court noted that "[i]t is difficult to see how an admittedly 'collateral matter' that is otherwise irrelevant suddenly becomes 'material' to the defense simply because the defendant chooses to testify about it on direct examination."  Id.  Here, Smith's testimony about his brother was not such a collateral matter.  See United States v.

27

Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993).[31]  The brother's

photograph did not "merely contradict" the defendant's

testimony.  Although the prosecution may have intended to

introduce the photograph solely for impeachment (although no

limiting proffer was made and no limiting instruction was

requested),[32] its effect, as the government has argued, was to

exclude the defendant's brother as a suspect.[33]  Again, the

dubiousness of the defendant's story did not render its rebuttal

collateral.  Far-fetched as it was, it involved the crime in

question.

The Kohli court noted other factors not present here that

tilted the balance in the government's favor in that case:  the

defendant's testimony was unexpected and the government produced

the coroner's records before questioning could continue and

defense counsel had an opportunity to review the records

overnight.  Here, the testimony was not entirely unexpected, as

---

[31] "A matter is collateral if 'the matter itself is not relevant
in the litigation to establish a fact of consequence, i.e., not
relevant for a purpose other than mere contradiction of the in-
court testimony of the witness.'"  Beauchamp, 986 F.2d 4
(quoting 1 McCormick on Evidence 169 (4th ed.1992)) (internal
quotation marks omitted).

[32] By contrast, the court specifically instructed the jury as to
the limited purpose of certain other photographic evidence
presented at trial.

[33] Gov't. Obj., doc no. 65, at 4; see also id. at 1.

the government was aware before trial of the possibility that Smith would try to implicate his brother, even mentioning the theory at a pretrial conference.[34]  Indeed, the government had considered calling the brother as a rebuttal witness, going so far as to produce Giglio information pertaining to the brother.[35] Further, as stated supra, the parties did engage briefly on the issue of defendant's brother during the testimony of the victim's father, presented during the prosecution's case-in-chief two days prior to the defendant's testimony.

Additionally, the photograph was admitted into evidence without limitation,[36] and without any advanced notice to the court, unlike the government's approach in Gilmore. Accordingly, the court does not find either of the government's supplemental arguments -- offered to establish that the alternate line of authority applying Rule 16(a)(1)(E)(i)'s "materiality" construct to inculpatory evidence does not apply here -- dispositive of the issue.

---

[34] Gov't. Supp. Memo., doc. no. 68, at 11, n.1.

[35] See Def. motion to compel Brady disclosure, doc. no. 57; Gov't. Supp. Memo., doc. no. 68, at 11, n.1.

[36] In fairness to the government, defense counsel requested no limiting instruction restricting the evidence to impeachment purposes, as it had done with other evidence.  See Fed. R. Evid. 105.

3.    Resolution; prejudice

Thus, there are two diverging lines of authority on the general question of "materiality" under Rule 16(a)(1)(E)(i), and both have strengths and weaknesses.  As Marshall observes, the plain language of Rule 16 -- "material to preparing the defense" -- "does not compel the conclusion that inculpatory evidence is immune from disclosure" because it "is just as likely to assist in 'the preparation of the defendant's defense' as exculpatory evidence."  132 F.3d at 67.  As particularly relevant here, such "assistance" extends to the decision to present "a defense which is undercut" by the evidence.  Id. at 68 (quoted in 2 Charles Alan Wright and Peter J. Henning, Federal Practice and Procedure, § 254, n.17 (4th ed. 2009)).

On the other hand, as the Court of Appeals acknowledged in Marshall, such a rule runs the risk of requiring prosecutors to predict what defenses, strategy and tactics a defendant or defense counsel might employ at trial.  "The prosecutor need not guess that evidence may become material as a consequence of defendant's not-yet revealed strategic decisions."  132 F.3d at 69 n.2.[37]  Such a requirement may be prohibitively burdensome, if

---

[37] This concern is attenuated here, because, as previously noted, the government was aware of the possibility that Smith might try to shift the criminal blame to his brother before he testified. In addition to the discussions of the possibility that Smith

not impossible, to satisfy.  Moreover, an interpretation of Rule 16 that essentially requires the government to assist the defendant in deciding whether to commit perjury or offer otherwise false testimony is decidedly unattractive.  Again, as the D.C. Circuit Court of Appeals stated in Marshall, "Nor must the prosecutor assume that the defense will make false assertions about the facts, hence making relevant contrary evidence that would not have been relevant had the defense adhered to the truth."  Id. at 69 n.2.

In the end, while this court views the prosecution's interpretation of "materiality" under Rule 16(a)(1)(E)(i) as the better rule under most normally-contemplated circumstances, it

---

might shift blame to his brother at pretrial and chambers conferences, the spectre of Smith's blame-shifting was evidenced in at least three other ways.  First, by the prosecutor's re-direct examination of the victim's father, which would not have included questioning about Smith's brother (and their relationships with the victim) absent some inkling of the defense potentially to come.  See supra, pp. 25-26.  Second, well before the defendant testified, the prosecution placed the defendant's brother under subpoena as a rebuttal witness. Third, before Smith testified, the prosecution made Giglio disclosures about the defendant's brother, prompting a defense motion seeking certain information about him.  See Doc. no. 57. The government argues that "[a]t the May 22 hearing, . . . the suggestion was made that the government knew the defendant would testify and blame his brother."  Doc. no. 68 at 11, n.1 (emphasis added).  The court made no such suggestion, instead noting only what the government had confirmed before, during and after the trial:  that it was aware the defendant might testify, and that he might accuse his brother of the video-recorded assaults.

is not to resolve the issue in this case. Even if the picture of Smith's brother's exposed penis was "material to preparing the defense," and the government violated Rule 16 when it failed to disclose the photograph prior to confronting Smith with it, the failure caused Smith insufficient prejudice (if any) to warrant the "last resort" remedy of mistrial.[38]

The First Circuit Court of Appeals has regularly cautioned that prejudice is required before a trial court can order such extraordinary relief. For example, in United States v. Hemmer, our Court of Appeals affirmed the district court's denial of a motion for mistrial by stating the general proposition that "[i]n order to succeed on a claimed violation of Rule 16 of the Federal Rules of Criminal Procedure a defendant must demonstrate that he has been prejudiced." 729 F.2d 10, 14 (1st Cir. 1984). The Court put a finer gloss on the prejudice requirement in United States v. Alvarez, where it reversed a defendant's conviction because the government's Rule 16 violation involved evidence "that was vital to the conviction." 987 F.2d 77, 86 (1st Cir. 1993). See also, United States v. Correa-Alicea, 585 F.3d 484, 494 (1st Cir. 2009) (affirming denial of mistrial

---

[38] Aside from the lack of any objection to admission of the picture of Smith's brother, the defense did not request any alternative measures, such as a continuance to confer with Smith or a limiting instruction regarding the photograph.

where defendant did not show that he was prejudiced by the government's alleged failure to produce a recording prior to trial); United States v. Richman, 600 F.2d 286, 291 (1st Cir. 1979) (holding that government's failure to comply with Rule 16 was "regrettable . . . [but] not so prejudicial as to warrant dismissal.")[39]  No such prejudice is discernable here.

As noted, the evidence against Smith was overwhelming, and save the defendant's implausible (and conclusively discredited) last-ditch effort, the prosecution's entire case went unchallenged and unrebutted.  The photograph of defendant's brother was not "vital to the conviction."  Alvarez, 987 F.2d at 86.

First, the defendant's crimes were video-recorded; his criminal actions were documented, preserved, and stored on his own computer hard drive, so there was no question but that the crimes occurred.  What is more, the creation, storage and preservation of the offending video recordings eliminated any reasonable doubt but that he was the individual who had recorded, preserved and stored the evidence of his own crimes.

---

[39] In United States v. Rossetti, 768 F.2d 12, 15 (1st Cir. 1985), the Court of Appeals indicated that the defendant's burden to demonstrate prejudice might decrease if the government acted in bad faith in withholding evidence.  The court finds no bad faith motivation here.  The government has provided authority supporting its position.

The recordings themselves -- which contained both visual and audible evidence -- were the best and most inculpatory evidence of his guilt.

And while the charged video recordings of the assaults did not show the abuser's face, Smith's lengthy courtroom testimony -- and his recorded confession -- gave the jury ample opportunity to compare his highly similar voice and vocal mannerisms to those of the male perpetrator in the offending video recordings. In addition, the recordings showed the assailant's pants, distinctively stained shoes and a carpenter's level, which were identical to those which belonged to the defendant and which were found in his bedroom.

Moreover, the external hard drive on which the offending recordings were stored was tethered to <u>his</u> laptop and found in <u>his</u> bedroom. In addition to the hard drive itself, the file storage method used to store the charged recordings was identical to that used to store other pornography that Smith admitted owning, including hidden-camera nude images that he created of another juvenile female who he previously lived with. This one-sided factual scenario almost conclusively established his control over the hard drive containing he charged video recordings.

Next, the prosecution presented metadata, as well as the logical inference from the point of view of the recordings confirming that those recordings were made with Google glasses, a product which Smith admitted to owning, which the victim's father testified he wore frequently, which was found on defendant's bedside table, and which would create "point of view" images completely consistent with the six offending video-recordings.

The victim's father (and the defendant himself) also identified the location of the assaults depicted in the recordings -- his barn in New Hampshire -- as one to which Smith had regular daily access, and the victim of the assault -- his daughter -- as someone who was close to and trusted Smith.

Finally, Smith himself provided the most compelling evidence against himself during his recorded confession. He first told Inspector Kibodeaux that he collected child pornography because he was a "danger junky" who liked "forbidden things." He then voluntarily confessed to recording himself raping the three-year old victim, with his recorded confession also serving as a confirmatory exemplar to match his voice with that of the assailant's.

Next to the strength and volume of the evidence amassed during the investigation and presented at trial, the defendant's

35

last-ditch-effort to accuse his brother of his crime was inconsequential. The resulting prejudice, if any, was infinitesimal.

Smith alleges that he was prejudiced in several different ways by the introduction of his brother's photograph. Before addressing Smith's arguments regarding prejudice, the court here pause to note the mental posture it must assume to do so. In order to assess the defendant's prejudice arguments, the court must accept, at face value, a highly counterintuitive assumption: that the prosecution's alleged discovery violation impermissibly permitted the defendant to testify false in a way that -- unfortunately for him -- turned out to be demonstrably false. The court nonetheless addresses his arguments, but finds none availing.

The court first notes that defense counsel's failure to object to the introduction of the photograph or to seek a continuance -- or even a break in the trial or any other form of relief -- undercuts his claim of prejudice. See Hemmer, 729 F.2d at 13 ("Significantly, there was no request for a continuance either to digest the reports or to prepare a new defense."); see also United States v. Gladney, 563 F.2d 491, 494 (1st Cir. 1977) (rejecting claim of prejudice where defendant refused court's offer of a continuance). This bears directly on

Smith's first argument -- that he did not have an opportunity to investigate the photograph, or the circumstances surrounding its creation.  But defense counsel made no request to do so, even when it had the opportunity at trial.  It was the court, on its own initiative, that developed a record of the prosecution's creation and acquisition of the photograph, but only after the defendant left the witness stand, the defense rested, and the court held a brief on-record jury charge conference which didn't involve any discussion of the photograph.  Only at that point, under sua sponte questioning by the court, did the prosecution explain how, why, and when, the photograph had been taken.

Relatedly, Smith argues that he was deprived of the opportunity to investigate the (highly remote) that his brother was circumcised recently, after the charged video recordings were made.  To some extent this is true.  Again, however, counsel made no request for such an opportunity -- a request the court would have surely considered.  But even despite these obstacles, the defense was not denied the opportunity to pursue the subject.  During re-direct examination, Smith testified that when he and his brother "were kids [he] believed [his brother] to be uncircumcised, you know, that was the only time that I

ever really saw his penis."[40]  So defense counsel had ample opportunity to, and actually did, elicit testimony from the defendant that he had no knowledge of whether his brother's penis was in a circumcised state at the time of the video-recorded assaults.  But in closing argument, rather than following up Smith's testimony by arguing that Smith's brother might have been circumcised after the assault, and thus sometime after childhood (i.e., "the only time [Smith] ever really saw his penis,") counsel understandably conceded that it was "pretty likely now it was not [the brother]."[41]

It makes no sense for Smith to argue that he was prejudiced by the timing of the prosecution's use of the photograph.  That timing -- as well as the fact that the photograph was presented at all -- was the result of the defendant's own conduct, and was under his control.  The defendant testified at trial that he "knew" of his brother's guilt as soon as the authorities confronted him with the evidence in Louisiana.  Taking that claim at face value, nothing prevented the defendant from disclosing his purported knowledge of his brother's guilt at any time during or after his arrest, during the entire pretrial

---

[40] Tr., doc. no. 72 at 95.

[41] Id. at 117.

period, through the suppression litigation, right up to the time of trial.  Of course, the defendant was under no obligation to provide that information,[42] but had he done so at any earlier time, the prosecution and investigators could have demonstrated their ability to eliminate his brother as a possible assailant much sooner.  This would have given him plenty of time to consider declining to testify, testifying differently, or pleading guilty, as opposed to undertaking his baseless testimonial accusation at the last possible moment.  But it was his choice to dramatically delay his disclosure of his purported "knowledge" of his brother's guilt, and to do so on the witness stand -- all at the very end of the trial -- that triggered the prosecution's last-minute investigatory measure (photographing his brother) and evidentiary debunking of his claim (confronting him with the photo at trial).  So the defendant cannot be heard to claim prejudice based on the timing of an eleventh-hour trial event when it was the very lateness of his false disclosure that precipitated the event.

---

[42] The court's point is not to suggest that the defendant had some obligation to communicate with the investigating or prosecuting authorities.  Of course, the Fifth Amendment provides otherwise.  The point here is only that the timing of the photograph's creation and use was triggered by his own delayed "disclosure" regarding his brother.  Thus, he can claim no prejudice resulting from that delay.

Smith next argues that the photograph of his brother created the impression that he was lying when he testified that he gave a false confession.  In terms of prejudice, however, such a credibility-based argument is a non-starter where, as here, Smith's entire defense was premised on the very idea that his own statement to the police -- his detailed confession -- was nothing more than an elaborate lie.  Smith's defense required the jury to disregard his words to the police as a multi-faceted fabrication; the thrust of his defense was to say to the jury, "You can't believe my earlier statement.  I was lying."  Not only was Smith's credibility already damaged by conceding that he lied to police (a lie which stood "uncorrected" until the closing moments of trial), the evidence arrayed against him even before he took the stand made his last-ditch accusation highly implausible.  As such, the court rejects Smith's claim of prejudice based on damage to his credibility.

In his third prejudice-related argument, Smith claims that the government's withholding of his brother's photograph prevented defense counsel from litigating -- before trial -- evidentiary objections to the photograph, such as foundation, authentication and relevance.  Preliminarily, any prejudice based on these issues presumably requires some showing undermining the photo's authenticity, foundational sufficiency,

or relevance. The defendant makes no attempt at any such showing, and the court cannot conceive of any evidentiary flaw or infirmity.

More importantly, this undeveloped argument overlooks a crucial fact: the photograph did not exist before trial, so there was never an opportunity for pretrial litigation.[43] The defendant certainly cannot have been prejudiced by a deprivation of a pretrial opportunity to challenge an item of evidence if it did not exist before the trial. And it was the defendant's conduct -- an easily refutable accusation of an innocent third party -- that triggered the introduction of the evidence to begin with. Finally, as previously noted, the defense interposed no objection at trial to its admission into evidence. Nothing about the timing of the photograph's introduction prevented defense counsel from raising timely foundation, authenticity or relevance objections (which appear to lack merit anyway). The court is able to address evidentiary issues at trial, and would have done so here if an objection had been lodged.

Smith next argues that the government's putative discovery violation prevented him from making an informed decision on

---

[43] Id. at 100.

whether to testify at trial. There are at least two factors which undermine this claim of prejudice. First, given that Smith provided a recorded, "Mirandized" confession, he had little practical choice but to testify in order to explain the confession. Without his testimony, the only evidence from his lips heard by the jury would have been his coaxing the child victim through the assaults on the offending video-recordings, and his straightforward confession to the crime, confirming that those video-recordings captured his image and voice while assaulting the child victim. While the defendant certainly had the right to decline to testify, his detailed confession and video-recorded explanation of his affinity for child pornography made testifying a near-requirement of a trial strategy that had any hope of success. So it wasn't so much that his decision to testify (already a foregone conclusion) was seriously impacted, it was his decision to falsely accuse his brother that he may have abandoned as futile had the photo been disclosed before he took the witness stand. And second, as the Marshall Court observed in a similar circumstance, "to the extent [the defendant] suffered any prejudice because the government was able to disprove his false statement, the defendant -- not the government -- is to blame." 132 F.3d at 70.

Smith's final claim of prejudice fares no better. He argues that he was deprived of the opportunity to make an informed decision whether to go to trial or plead guilty.[44] Here again, the defendant's argument ignores the fact that earlier disclosure could not have impacted his decision about going to trial; the photograph did not exist at the time that decision was made. Moreover, as previously noted, Smith could have alerted authorities to his purported knowledge of his brother's guilt at any time during the fourteen months after his arrest, but chose not to do so. It stands logic on its head to assign unfair prejudice to a situation that was of the defendant's own making.

## IV.   CONCLUSION

When considered against the mountainous backdrop of inculpatory evidence, the government's failure to produce the picture of Smith's brother -- regardless of whether it was obligated to do so -- was of little consequence to the outcome of the case. Ultimately, "because of not being forewarned that it was unsafe to lie, [Smith] was hoisted on his own petard.

---

[44]   The court assumes that this argument is premised on the idea of a pre-trial guilty plea. Of course nothing prevented the defendant from entering a guilty plea at any time between the introduction of the photograph and the jury's verdict.

But the question of guilt or innocence was not affected."

Gladney, 563 F.2d at 495.

The defendant's motion for mistrial is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  October 18, 2017

cc:  Jeffrey S. Levin, Esq.
     Bjorn R. Lange, Esq.
     Richard Guerriero, Esq.
     Seth R. Aframe, AUSA
     Georgiana L. Konesky, AUSA